IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 08-cv-01888-REB-XMT

THE UTE INDIAN TRIBE OF THE UINTAH AND OURAY RESERVATION,

   Plaintiff,

v.

JOHN P. JURRIUS
THE JURRIUS GROUP LLP
THE JURRIUS OGLE GROUP LLC,

   Defendants.

## OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

### I. Overview and Standard

  Motions for a judgment on the pleadings are evaluated under the same standard as motions under Rule 12(b)(6).  *See Corder v. Lewis Palmer Sch. Dist. No. 38*, 568 F. Supp. 2d 1237, 1242 (D. Colo. 2008).  Specifically, "a complaint must contain enough allegations of fact 'to state a claim…plausible on its face.'"  *Robbins v. Okla. ex rel. Dep't of Human Servs.*, 519 F.3d 1242, 1247 (10th Cir. 2008) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "Asking for plausible grounds…does not impose a probability requirement…it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence…."  *Bell Atl. Corp.,* 550 U.S. at 556.  Thus, "a well-pleaded complaint may proceed even if it strikes a savvy judge that…a recovery is very remote and unlikely."  *Id.* (internal quotations, citation omitted).

  The complaint raises more than merely plausible claims.  It alleges that through a series of complicated financial transactions, Defendants: wrongfully took ownership in

various tribal interests, CPL ¶¶ 4, 31-76; were in a position to conceal their actions, CPL ¶ 26; and tried to do so at least once, CPL ¶ 25. Such facts warrant relief.

## II. The IAA Claims Are Well-Plead and Timely

To void a contract under the Investment Advisers Act ("IAA"), Plaintiff must prove Defendant: is an investment adviser; used a means or instrumentality of interstate commerce; to misstate or omit a material fact; at least negligently. *See, e.g., Morris v. Wachovia Secs., Inc.,* 277 F. Supp. 2d 622, 644 (E.D. Va. 2003).

Defendants do not contest the last three elements, but instead argue that -- as a matter of law -- Plaintiff cannot show Jurrius was an investment adviser. Defendants' argument is founded on two faulty premises. First, Defendants claim Jurrius could not be an investment adviser because of a provision in the two Financial Consulting Agreements (the "FCAs"). Def. Br. 5. Second, Defendants claim the FCAs do not pertain to "securities" under the IAA. Def. Br. 6. Defendants are incorrect.

Defendants proffer no support for their unspoken proposition that Jurrius is only an investment adviser if the FCAs are themselves investment advisory contracts. As the SEC has made clear, "if the *activities* of any person...satisfy the elements of the definition, the person would be an investment adviser…." 52 Fed. Reg. 38,400 (Oct. 16, 1987) (emphasis added). "'[A]ny person who, for compensation, engages in the business of advising others…as to the value…[or] advisability of investing in, purchasing, or selling securities…'" is an investment advisor. *SEC. v. Nat'l Executive Planners, Ltd.*, 503 F. Supp. 1066, 1074 (M.D.N.C. 1980) (quoting 15 U.S.C. § 80b-2(a)(11)). Nothing in the IAA provides that only parties to certain contracts are investment advisers.

The IAA prohibits the exculpatory provision that Defendants now attempt to rely on. "Any condition, stipulation, or provision binding any person to waive compliance with any provision of this title…shall be void." 15 U.S.C. § 80b-15(a). The reason is obvious; any statute designed to prevent fraud by a fiduciary which can simply be circumvented by that same fiduciary would be meaningless, particularly where the evil sought to be avoided -- the abuse of a trusted position -- is especially suited to such machinations. Nevertheless, Jurrius has sought to contract away his duties to Plaintiff, by drafting FCAs purporting to remove him not from *any* provision of the IAA, but *every* provision. The IAA's definition of an "investment adviser" and its prohibition on such waivers demonstrate that Congress disapproved of such clauses.

Further exacerbating the problem is the provision itself. That provision, labeled "Standard of Care", does not mention the IAA or any other statute. It merely states:

> In the performance of services under this Agreement, **Consultant shall use that degree of care and skill ordinarily exercised by financial consultants with respect to their clients.** The Tribe acknowledges and agrees that Consultant is not acting as an "investment adviser," CFA, CIC, ChFC, CFP, CIMC, CIMA or securities broker/dealer of any type.

Def. Ex. A at 4 (emphasis added). This language speaks only to the care to be taken by Jurrius. It provides no indication that Jurrius's activities are not "investment advice," or that the provision is a (prohibited) waiver of the IAA's protection.

Whether Jurrius acted as an investment adviser is contingent upon his behavior, not his contract. The IAA prohibits the sort of exculpatory clause Defendants seek to rely on. In any event, the clause here is ambiguous and must be construed against Jurrius. *See, e.g., Jewelers Mut. Ins. v. Milne Jewelry Co.,* No. 06-CV-243, 2006 WL

3716112, at *3 (D. Utah Dec. 14, 2006).[1]  Therefore, the issue is whether Jurrius "for compensation, engage[d] in the business of advising others…as to the value…[or] advisability of investing in, purchasing, or selling securities."  15 U.S.C. § 80b-2(11).  Jurrius was compensated and provided investment advice on the interests at issue.

The IAA defines "security" as:

> any note, stock, treasury stock, security future, bond, debenture, evidence of indebtedness, ***certificate of interest or participation in any profit-sharing agreement***, collateral-trust certificate, pre-organization certificate or subscription, transferable share, ***investment contract,*** voting-trust certificate, certificate of deposit for a security, ***fractional undivided interest in oil, gas, or other mineral rights***…option, or privilege on any security…or, in general, any interest or instrument commonly known as a security, or any certificate of interest or participation in…or warrant or right to subscribe to or purchase any of the foregoing.

15 U.S.C. § 80b-2(18) (emphasis added).  Congress did not intend to adopt a narrow or restrictive concept of security.  *See Tcherepnin v. Knight,* 389 U.S. 332, 338 (1967) (interpreting "security" in the context of the Securities Exchange Act of 1934).[2]  The term "is capable of adaptation" and thus "'form should be disregarded for substance and the emphasis should be on economic reality."  *Sanders v. John Nuveen & Co.*, 463 F.2d 1075, 1077 (7th Cir. 1972) (internal quotations, citations omitted).  Here, both the form and substance of the agreements show they are securities as defined by the IAA.

First, the assignments of interest in the Exploration and Development Agreements ("EDAs") are clearly "fractional undivided interest[s] in oil, gas, or other mineral rights." 15 U.S.C. § 80b-2(18).  Such interests are "securities" when created

---

[1] All cases with "WL" citations are included herein as Exhibit A.

[2] The language of 15 U.S.C. § 80b-2(18) is substantively identical to the definition of "security" found in the Securities Act of 1933, *see* 15 U.S.C. § 77b, which, in turn, is treated as identical to the definition in the Securities Exchange Act of 1934, *see SEC v. Edwards,* 540 U.S. 389, 393 (2004).

with the contemplation of future sale.  For example, in *Woodward v. Wright*, 266 F.2d 108 (10th Cir. 1959), the defendant sold to plaintiffs "undivided 15/16ths interest in [a] leasehold estate…[including] stipulated fractional interests in the oil and gas leases." *Id.* at 113-14.  The leases were not offered generally -- the defendants approached specific individuals they knew from previous dealings and negotiated sales with them. *Id.* at 113.  Indeed, the plaintiffs in *Woodward* maintained significant control over their investment.  "Wright operated the lease, and when…the appellants were disappointed in the amount of their oil checks, they complained to Wright [and ultimately fired him]." *Id.* at 114.  The leases were "securities" because they "involved the creation of fractional undivided interests in oil and gas" and because:

> [t]he contract…clearly contemplated the creation of fractional interests therein and conveyance of the same to the respective purchaser-contractees.  That which was ultimately conveyed under the terms of the contract was, to be sure, fractional undivided interests in oil and gas.  They were created for the purpose of sale.  And, they were therefore securities within the meaning of the Act.

*Id.*  Here, the complaint alleges the Tribe, following Jurrius's advice, engaged in at least seven transactions involving "undivided fractional interests" in oil, gas, or other mineral rights, including the assignment of "undivided interests associated with certain oil and gas reserve exploration projects."  *See* CPL ¶¶ 34, 47, 51, 53, 58, 64-66, 70-72.

Further, the EDAs and the FCAs are "investment contracts" because they "involve[ ] an investment of money in a common enterprise with profits to come solely from the efforts of others."  *SEC v. Edwards*, 540 U.S. 389, 393 (2004) (payphone lease-back arrangement is an "investment contract"). [3]  The FCAs show no action on

---

[3] The word "solely" is not to be applied literally.  The question is whether a plaintiff was a "passive investor" or exercised "significant investor control."  *See, e.g., U.S. v. Leonard,* 529 F.3d 83, 88 (2d Cir. 2008); *Williamson v. Tucker,* 645 F.2d 404, 422 (5th Cir. 1981) ("The fact that the investor performs

the Tribe's part is contemplated other than the provision of capital and that the Tribe is to benefit from Jurrius's activities.  Similarly, each EDA was made with the contemplation that a third party would perform the work of exploring and exploiting any oil reserves found, that Jurrius would perform management duties, and that the Tribe would profit solely by virtue of its ownership.  *See, e.g., Woodward,* 266. F.2d at 112 ("an oil and gas lease, or an undivided interest therein, may be…an 'investment contract', hence a security…where the purchasers look entirely to the efforts of other persons [to make a profit]").

Finally, the complaint alleges the parties engaged in transactions involving "participation interests in a profit-sharing agreement."  Specifically, they bought and sold memberships in the various entities at issue.  *See* CPL ¶¶ 52, 54, 60, 61.  Such arrangements are "securities" within the meaning of the federal securities laws.  *See, e.g., Stowell v. Ted S. Finkel Inv. Servs., Inc.*, 489 F. Supp. 1209, 1219-24 (S.D. Fla. 1980) (limited partnership interest is a security); *Diaz Vicente v. Obenauer*, 736 F. Supp. 679, 692 (E.D. Va. 1990) ("participation agreement" is a security).

Defendants miss the point in arguing that the agreements capitalizing the entities are not "investment advisers contracts."  Def. Br. 7.  The issue is whether a violation of the IAA was "tangential to" or "inseparable from" the performance of the contract.  *See generally GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189, 200-01 (3d Cir. 2001) (discussing rescission under the Securities Act).  Here, each contract purporting to assign or transfer to Defendants an interest could not be executed without violating the

---

nominal services or physical labor gives him no access whatever to information about the issuer and affords no reason for depriving him of the protection of the securities laws.") (internal quotations, citation omitted).

IAA, because each such transfer was fraudulent, in violation of the IAA.

Regardless of whether the interests at issue here are characterized as "participation agreements", "investment contracts", "fractional undivided interests in oil, gas, or other mineral rights", or something else, they are clearly "securities", particularly when that term is given the broad construction mandated by the Supreme Court in *Tcherepnin*. Further, the agreements complained of are voidable because their execution necessarily involved a violation of the IAA.

The IAA claims are also timely. Defendants claim a one year statute of limitations and three year statute of repose applies to the IAA, and claim it has run. Def. Br. 7. But the Sarbanes-Oxley Act extended the statute of limitations where, as here, claims arise from fraud or deceit. 28 U.S.C. § 1658(b). Defendants' argument is simply incorrect; the limitations period is two years from discovery, and five years from commission, of the wrong. *Id.; Thomas v. Metro. Life Ins. Co.*, No. CIV-07-0121, 2008 WL 4619822, at *13-14 (W.D. Okla. Oct. 16, 2008).

Defendants are also incorrect as to when the statute of limitations began to run. Believing the statute of repose is only three years, Defendants have put forth no theory as to when that period began to run but posit that it must have begun on either: December 1, 2000 (when the parties entered into the first agreement); "in July 2002" (the date of the Amended Agreement); or May 4, 2005 (the date the Ute Energy and Ute Holdings contracts were entered into). Def. Br. 8. As an initial matter, "the burden of proof is upon the party pleading the statute of limitations to establish that the alleged claim is barred." *Holloway v. Wetzel*, 45 P.2d 565, 567 (Utah 1935). By simply proffering dates upon which the statute "must have begun" to run, Defendants have not

even attempted to meet this burden. In any event, none of Defendants' proposed dates are correct. In fact, the fraud occurred no earlier than May 4, 2005, the date that the Ute Energy, LLC and Ute Energy Holdings, LLC Operating Agreements purport to grant Jurrius ownership interests in those entities. Further, the fraud was not discovered until an outside auditor working for the Tribe in 2007 discovered that Jurrius had not properly contributed his pro rata share of capital. [4] Until that time, the Tribe had every reason to believe that Jurrius -- who continued to work for, and be a fiduciary of, the Tribe -- either had or would contribute his pro rata share. At the least, the efficacy of Jurrius's efforts to conceal the truth is a question of fact. *See, e.g., Dzenits v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 494 F.2d 168, 172 (10th Cir. 1974).

Defendants' confusion stems from their mistaken belief that "the date of the wrong is the date the parties entered into the contract sought to be rescinded." Def. Br. 7. The cases cited by Defendants on this matter are not on point; each of them involved discrete, fully consummated transactions. For example, in *Kahn v. Kohlberg, Kravis, Roberts & Co.*, 970 F.2d 1030 (2d Cir. 1992), *superseded by statute on other grounds,* defendants induced plaintiffs into entering an arrangement whereby plaintiffs "irrevocably committed to investing $146.6 million…for investments that [defendant] chose…." *Id.* at 1032. Thus, "defendants entered into one discrete contract with plaintiffs after which plaintiffs were committed to invest a set amount of money." *Id.* at 1041. In rejecting the theory that each subsequent installment payment was a new violation, the Second Circuit stated, "[t]he test…is whether the plaintiff was committed to

---

[4] Plaintiff's counsel has recently become aware of evidence that Jurrius's efforts at concealment went beyond the letter referred to in CPL ¶ 25, including withholding information from certain members of the Business Committee. Plaintiff intends to move to amend the complaint to more fully present these issues.

pay that amount under the contract or whether he retained the right to terminate the contract…." *Id.* at 1040 (citation omitted). In contrast, the FCAs renew annually and are terminable by either party during certain periods, or by Plaintiff at any time by meeting certain conditions. This is a far cry from *Kahn's* one-time, discrete contract.

Similarly, in *Phoenix Four, Inc. v. Strategic Res. Corp.*, No. 05 Civ. 4837, 2006 WL 399396 (S.D.N.Y. Feb. 21, 2006), the court refused to find that the statute of limitations ran from the date of a secondary agreement between the parties *because* "the Amended Agreement on which [plaintiff] pins its hopes was never executed…." *Id.* at *6. But the facts here involve numerous transactions, each involving securities, each fully executed, and each an independent breach of Defendants' duties under the IAA.[5]

Moreover, the complaint alleges that Defendants' actions were a cohesive fraudulent scheme, which continues to damage Plaintiff. Thus, the statute of limitations should be extended pursuant to the "continuing wrong" doctrine, whereby "the claim accrues each time the plaintiff sustains damages." *Kahn,* 970 F.2d at 1039. Defendants imply that the doctrine never applies to securities claims. But as the Second Circuit explained in Defendants' cited case, "[f]ederal courts do recognize a continuing wrong theory" when appropriate. *Id.* "The rule is based primarily upon the impracticality and unfairness of requiring a plaintiff to institute his action before he can predict his damages." *Id.* (citation omitted). Where the relationship between the parties "constitute[s] a prolonged and continuing invasion of the rights of [one of them]," the doctrine has been applied. *Id.* at 1040 (internal quotations, citation omitted). Here, Defendants continue to claim an interest in entities to which they are not entitled. This

---

[5] Notably, the most recent agreement concerning ownership interests in Ute Energy, LLC was executed by the parties on July 9, 2007, well within the limitations period.

is the sort of "prolonged and continuing invasion" of an interest necessitating application of the doctrine.

Because the transactions here are not single, discrete contracts, but a series of separate, albeit related, transactions, each is an independent violation of the IAA. Therefore the statute of limitations does not bar their rescission. Further, because the harm visited upon Plaintiffs persists to this day, the "continuing wrong" doctrine applies.

### III.  The IMDA Claims Should Not Be Dismissed

Defendants argue the Indian Mineral Development Act ("IMDA") is limited to agreements for the actual development, sale or disposition of tribal minerals, and that the FCAs do not qualify as IMDA agreements because they involve only an "assessment" of the Tribe's oil and gas resources for "possible future development." Def. Br. 9-10.  Neither IMDA nor the FCAs can be read so narrowly.

Congress enacted IMDA to increase Indian tribes' flexibility to enter into "*various kinds* of *commercial* agreements for the development…[and] disposition of…mineral resources."  H.R. Rep. No. 97-746, at 3 (1982) (Def. Ex. C) (emphasis added).  Under the statute's express language, IMDA agreements span a broad spectrum, from "joint venture" and "production sharing" agreements to "service" and "managerial" agreements, and "any other" agreements for the "exploration" or "development" of mineral resources or "the sale or other disposition" of the "production or products of such mineral resources."  25 U.S.C. § 2102(a).

Congress made clear that by "enumerating various kinds of agreements" in the text of IMDA, it was not limiting the scope of the non-lease agreements IMDA authorizes.  Def. Ex. C at 3.  Rather, Congress intended to allow tribes to increase the

return from their mineral resources by entering into "innovative, flexible business arrangements," subject only to the approval of the Secretary of Interior.  *Id.* at 1; *see Quantum Exploration, Inc. v. Clark*, 780 F.2d 1457, 1459 (9th Cir. 1986) (without Secretarial approval, there is no enforceable agreement under IMDA).

In analyzing the FCAs, the Court must read and construe them as a whole.  *See, e.g., Utils. Prod. Corp. v. Carter Oil Co.*, 72 F.2d 655, 657 (10th Cir. 1934) (court must read and construe Tribal oil and gas leases as a whole).  Under such an analysis, the FCAs fall squarely within IMDA's broad spectrum of "business arrangements."

The FCAs identify three categories of services Jurrius would provide:  Financial Consulting; Business Development; and Energy Development.  *See* Def. Ex. A at 1-3.  Among other things, Jurrius would assist the Tribe in evaluating oil and gas resources and "developing business opportunities on and off the reservation."  *Id.* at 3.  Additionally, the FCAs granted Jurrius a "Participation Option" allowing him to obtain ownership interests in the Tribe's mineral estate and other assets.  *Id.* at 5.  In fact, the first FCA states "[w]here possible" the participation "shall" be a "direct participation" with "ownership interests…assigned directly" to Jurrius.  *Id.* at 5.  Thus, the FCAs allowed Defendants to obtain *direct* ownership interests in the Tribe's mineral estate.  Once Defendants gained a direct "ownership interest" in the Tribe's minerals, they would be co-owners with the Tribe, sharing in production from the Tribe's oil and gas resources.  As alleged, that is what happened.  Plaintiff, at Jurrius's direction, organized certain entities, capitalizing them with its mineral interests in various EDAs, CPL ¶¶ 31-49, 73, and Defendants now improperly claim "direct" ownership interest in those entities via the FCAs.  *Id.* at ¶¶ 32, 64-76.

On multiple levels of analysis, the FCAs fall squarely under IMDA.  First, they provide expressly for professional "services" to be rendered relating to the development of the Tribe's energy resources.  Second, they granted Defendants the option to obtain direct ownership interests in the Tribe's mineral resources and transactions or projects for developing those resources.  Third, once Defendants exercised the option, the consequent transfer of minerals necessarily constituted a "disposition" of the Tribe's mineral resources and the production from those resources.  Finally, once Defendants exercised the participation option and obtained a direct ownership interest in the Tribe's mineral assets, they could, as a matter of law, participate with the Tribe in the development of its minerals and share in production from its mineral resources.  Given these multiple levels of application, it is difficult to conceive of an agreement more fully within the ambit of IMDA than those at issue here.

**V.  The Economic Loss Doctrine is Inapplicable**

Defendants claim the economic loss doctrine bars claims for breach of fiduciary duty because the actions complained of breached contractual duties.  The common-law claims here arise under Federal common law.  *See County of Oneida v. Oneida Indian Nation*, 470 U.S. 226, 240-44 (1985).  Defendants' arguments that these claims are barred by state law doctrines or statutes are misplaced.  *Id.* ("There is no federal statute of limitations governing federal common-law actions by Indians...borrowing of a state limitations period in these cases would be inconsistent with federal policy.").

In any event, the fact that Defendants' actions breached contractual duties does not end the inquiry.  "The proper focus…is on the source of the duties alleged to have been breached."  *Hermansen v. Tasulis*, 48 P.3d 235, 240 (Utah 2002) (citation

omitted). Hence, "a party suffering only economic loss from the breach of [a] contractual duty may not assert a tort claim for such a breach *absent an independent duty of care under tort law.*" *Id.* (emphasis added). Here, Defendants owed (and breached) such an independent duty. "[T]he IAA creates a fiduciary duty on the part of investment advisers…." *Morris v. Wachovia Secs., Inc.*, 277 F. Supp. 2d 622, 644 (E.D. Va. 2003) (internal quotations omitted). That Defendants' actions *also* breached contractual duties does not mean they did not simultaneously breach the duties imposed by Federal law. Indeed, at least one court has found it "reasonable to infer that investment advisors are given a…degree of discretion and independence that cannot be memorialized in a contract and studied by the parties, and are therefore intangible enough to come within the exceptions to the Economic Loss Doctrine." *Chicago Hous. Auth. v. J.A. Hannah Inv. Advisory Serv., Inc.*, No. 95 C 5251, 1996 WL 328033, at *7 (N.D. Ill. May 9, 1996) (internal quotations, citation omitted). Further, Defendants' argument ignores the allegations of fraud and conversion, which are also breaches of fiduciary duty. Defendants' contractual duties do not negate these other duties. Accordingly, the economic loss doctrine is inapplicable.

## VI. The Claim For Common Law Fraud is Adequately and Timely Pled

The elements of fraud are: a knowing or reckless false representation concerning a presently existing material fact; for the purpose of inducing another to act upon it; which the other party reasonably relies on in acting to its own detriment. *See, e.g., Republic Group, Inc. v. Won-Door Corp.*, 883 P.2d 285, 292 (Utah Ct. App. 1994).[6]

---

[6] As noted above, these claims arise under Federal common law, not state law. However, even under Utah law, they are timely for the reasons that follow.

Rule 9(b) mandates that the false representation be plead with particularity, but that rule must be read in conjunction with the principle of notice pleading set forth in Rule 8, which requires only "a short and plain statement…[giving] adequate notice to an adverse party [to] enable him to prepare a responsive pleading." *Dahl v. Gardner*, 583 F. Supp. 1262, 1267 (D. Utah 1984) (internal quotations, citation omitted).

The complaint alleges that Defendants claim ownership interests in certain entities despite their failure to contribute the required pro rata share of capital. Each transaction at issue was entered into by the Tribe solely because Defendants fraudulently induced the Tribe into entering it, in part by misrepresenting their own existing interests. Further, each transaction in which Defendants claimed ownership interests that they did not actually possess has been plead with specificity, including the date of the transaction, the amount of interest Defendants claim to have assigned, and why they did not actually possess such interest. This is enough to provide notice.

Nor are the claims untimely. Utah's statute of limitations is three years, and is tolled until "discovery of facts forming the basis for the cause of action." Utah Code Ann. § 78B-2-305(3). *See also Russell Packard Dev., Inc. v. Carson.*, 108 P.3d 741, 746 (Utah 2005). As noted above, the earliest Plaintiff could have discovered such facts was in 2007, when an independent auditor working for the Tribe discovered the fraud.

In any event, when the Tribe discovered its cause of action is a "highly fact-dependent" question "necessarily…left to trial courts and finders of fact." *Id.* at 750 (internal quotations, citation omitted). Indeed, the fraud statute of limitations "almost always presents a question of fact as to when plaintiff did [or should have] discovered the defendants' wrongdoing.…" *Dahl*, 583 F. Supp. at 1266 (internal quotations, citation

omitted).  This is particularly true where, as here, evidence suggests Defendants' efforts to conceal their fraud.[7]  *See, e.g., Hill v. Allred*, 28 P.3d 1271, 1277 (Utah 2001) ("Distinguishing among these conflicting stories is…inappropriate for…summary judgment.").  This issue should be deferred until further discovery.

## VII.  The Complaint Adequately States a Claim for Conversion

Defendants claim intangible interests cannot be converted.  Def. Br. 13.  Defendants have cited nothing to support this, and are contradicted by numerous decisions.  *See, e.g., Zouck v. Antlers Ranch*, No. 94-8032, 1996 WL 227672 (10th Cir. 1996) (shares in closely held corporation); *Cowles v. Dow Keith Oil & Gas, Inc.*, 752 F.2d 508, 513 (10th Cir. 1985) (taking interest in oil wells not conversion without intent); *Sunrise Fin., Inc. v. Painewebber, Inc.*, 948 F. Supp. 1002, 1009 (D. Utah 1996) (ownership rights in shares of company), *partially vacated on other grounds*, 164 F. Supp. 2d 1277 (D. Utah 2001).  Plaintiff alleges Defendants took ownership interests in entities which rightfully belong to Plaintiff.  This is sufficient to plead conversion.

For all of the foregoing reasons, Defendants' motion must be denied.

**FREDERICKS PEEBLES & MORGAN LLP**        **MILBERG LLP**

/s/ Thomas W. Fredericks        /s/ Benjamin Y. Kaufman
*Thomas W. Fredericks*        *Benjamin Y. Kaufman*
1900 Plaza Drive        One Pennsylvania Plaza, 49th Floor
Louisville, CO 80027        New York, New York 10119
Tel: (303 ) 673-9600        Tel: (212) 594-5300
Fax: (303) 673-9155        Fax: (212) 868-1229
tfredericks@ndnlaw.com        bkaufman@milberg.com

**Counsel for Plaintiff**        **Counsel for Plaintiff**

---

[7] The complaint clearly alleges at least one such event in 2004.  CPL ¶ 25.