IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 08-cv-1888-REB-KMT

THE UTE INDIAN TRIBE OF THE UINTAH and OURAY RESERVATION,
    Plaintiff,
v.

JOHN P. JURRIUS,
THE JURRIUS GROUP, LLP,
THE JURRIUS OGLE GROUP LLC,
    Defendants.

___

### PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO DISMISS THE AMENDED COUNTERCLAIMS
___

A claim for breach of contract should be dismissed under Rule 12(b) if the contract sued upon is void, or if the contract has not received required approval. *Pleva v. Norquist*, 195 F.3d 905, 918 (7th Cir. 1999)(no enforceable contract); *Palda v. General Dynamics Corp.*, 47 F.3d 872, 874-75 (7th Cir. 1995)(failure to plead requisite shareholder approval). The Tribe's motion cited seven (7) *alternative* grounds on which the Court should find that Defendants have failed to allege enforceable rights under the Financial Consulting Agreement and Amendment (FCAs) and Tribal Ordinance No. 06-005.[1] If the Court finds that the FCAs and Ordinance are not enforceable under any one of the alternative grounds, it will not be necessary for the Court to address the remaining grounds for dismissal. Because of the Court's page limitation on replies, the

---

[1] Those grounds are that, absent federal approval, the FCAs and Ordinance violate (*i*) common law restraints on the alienation of Indian property; (*ii*) the Indian Nonintercourse Act, 25 U.S.C. § 177; (*iii*) the Indian Mineral Development Act ("IMDA"), 25 U.S.S. § 2102(a); (*iv*) the 1934 Indian Reorganization Act ("IRA"), 25 U.S.C. § 464; (*v*) 25 U.S.C. § 85; and (*vi*) the Ute Tribe's Constitution, art.VI, §§ 1, 1(c) & 1(l); as well as (*vii*) sovereign immunity.

Tribe's reply is limited to discussing three of the more compelling grounds for dismissal, and responding to other arguments in the Defendants' Response.[2]

### I. Without Secretarial Approval the FCAs are a Legal Nullity Under Both the Tribe's Own Constitution and 25 U.S.C. § 464

Defendants are very dismissive of the federal-approval requirement for the alienation of Indian assets, describing federal approval as a mere "legal technicality." Doc. 69, p 14. But this dismissive characterization reflects a profound misunderstanding of federal Indian law, and the policies and purposes underlying federal prohibitions on the alienation of Indian property interests. As articulated by Chief Justice John Marshall, Indian tribes "occupy a territory to which we assert a title independent of their will, which must take effect in point of possession when their right of possession ceases. Meanwhile…. [t]heir relation to the United States resembles that of a ward to his guardian." *Cherokee Nation v. Georgia*, 30 U.S. 1, 17 (1831). As a consequence of the imposed dependency, the federal government from its inception has assumed trust responsibilities and prerogatives over Indians and their property. *E.g., U.S. v. Kagama*, 118 U.S. 375, 384-85 (1886).

In view of the federal government's assumption of trust responsibilities to tribes, the government has a strong interest in controlling, preserving and protecting tribal assets. The historical record, of course, is that the federal government has not always preserved and protected tribal assets. During the "allotment and assimilation" era, from 1871 to 1928, the land holdings of Indian tribes was reduced from 138 million acres to

---

[2] With respect to the Tribe's other statutory arguments, the Defendants construe the statutory language much too narrowly, in violation of the canon that statutes enacted for the benefit of Indian tribes must be construed liberally to the benefit of tribes. *See infra*, pp 5-6.

48 million acres.  COHEN'S HANDBOOK OF FEDERAL INDIAN LAW, § 1.04, p. 78 (5th Ed.).  But largely in reaction to those failed policies, the Indian Reorganization Act ("IRA") of 1934 marked a diametrical shift in the government's policy.  Since 1934, the public policy of the federal government, as enunciated in the IRA, has been to preserve, protect and even increase tribal asset bases.  As explained in COHEN'S HANDBOOK, at 86-87, "[t]he IRA was designed to improve the economic status of Indians by ending the alienation of tribal land and facilitating tribes' acquisition of additional acreage and repurchase of former tribal domains."  To these ends, the IRA explicitly prohibits the Secretary of Interior from approving any "sale, devise, gift, exchange, or other transfer of restricted Indian lands or of shares in the assets or any Indian tribe or corporation organized" under the IRA, unless Secretarial approval has been "directed" or authorized by Congress.  25 USCS §§ 462, 464, and 25 USCS § 177.  Statutes such as 25 USCS §§ 177, 462, 464 and others are part of a complex legislative scheme prohibiting and restricting the alienation of Indian property interests, and those statutes must be read *in pari materia* and construed with reference to each other.  *See, e.g., U.S. v. Prentiss*, 206 F.3d 960, 973 (10th Cir. 2000).

Plaintiff Ute Tribe is organized and incorporated under the IRA, and like most IRA tribes, its tribal Constitution incorporates, mirrors, and even expands upon the restraints on alienation of Indian property contained in 25 USCS § 464 and other statutes.  Ex. B, p 5.  Consequently, without Secretarial approval, the Tribe's prior Business Committee had no authority under the Tribe's Constitution to enter into an agreement which granted Defendants a legal right to assert "*ownership interests*" or other claims to tribal

assets. The powers delegated to the Tribe's Business Committee are expressly subject to "*any limitations imposed by the statutes or the Constitution of the United States.*" (emphasis added) Ex. B, p 5, art. VI, § 1. In addition, the Tribe's Constitution provides expressly that the Business Committee may not sell, dispose of, lease or otherwise encumber "*tribal lands, interests in tribal lands, or other tribal assets*" without first obtaining the approval of the Secretary of the Interior. *Id.* at art. VI, § 1(a).

Defendants complain the Tribe has cited no authority for its argument that the FCAs are a legal nullity under the Tribe's Constitution. Doc. 69, p 7. No authority is required since the Constitution's language itself is plain and authoritative, and this Court should defer to the Tribe's interpretation of its own Constitution if that interpretation is reasonable. Further, the proposition that a constitutional body is limited to its delegated powers is a tenet of constitutional jurisprudence first articulated in the landmark case of *Marbury v. Madison*, 5 U.S. (Cranch 1) 137 (1803):

> The powers of [a constitutional body] are defined and limited; and that those limits may not be mistaken or forgotten, the constitution is written. To what purpose are powers limited, and to what purpose is that limitation committed to writing, if these limits may, at any time, be passed by those intended to be restrained? The distinction between a government with limited and unlimited powers is abolished if those limits do not confine the persons on whom they are imposed, and if acts prohibited and acts allowed are of equal obligation. It is a proposition too plain to be contested, that the constitution controls any legislative act repugnant to it; or, that the legislature may not alter the constitution by an ordinary act.

*Id.* at 176-77. In *Marbury v. Madison* the Supreme Court could not grant Mr. Marbury the relief he requested because the Congressional act on which Mr. Marbury asserted his legal rights was unconstitutional—it was *ultra vires*, beyond the powers delegated to Congress under the U.S. Constitution. Similarly, here, the FCAs and Tribal Ordinance

- 4 -

No. 06-005, on which Defendants assert their legal rights, are null, void, and unenforceable because they are *ultra vires*--beyond the powers delegated to the Ute Tribe's Business Committee under the Tribe's Constitution.  To quote Justice Marshall, the prior Business Committee's approval of the FCAs, without Secretarial approval, was an "ordinary act" that impermissibly attempted to grant the Defendants a legal claim to interests in tribal lands or "other tribal assets" in violation of the Tribe's Constitution and 25 USCS § 464 and other federal common law and statutory restraints on the alienation of tribal property.[3]

Absent Congressional authorization under 25 USCS §§ 177, 464, or some other statute, *and* without Secretarial approval pursuant to such Congressional authorization, Defendants cannot allege the requisite federal approval for an enforceable contract under § 464 or the Tribe's Constitution.  *Black Hills Inst. of Geological Research v. South Dakota School of Mines and Tech.*, 12 F.2d 737, 742-43 (8th Cir. 1993); *see also Palda*, 47 F.3d at 874-75; *Interstate Nuclear Servs. Corp. v. City of Santa Fe*, 179 F. Supp.2d 1253, 1257-58 (D.N.M. 2000)(a municipal ordinance adopted in excess of the City's delegated authority was null, void and unenforceable).  Further, in determining the reach of § 464 and the meaning of words in the Tribe's Constitution, the Court is required to follow the Supreme Court's caveat that "the standard principles of statutory interpretation do not have their usual force in cases involving Indian law."  *Montana v.*

---

[3] In both their Response and Amended Answer and Counterclaims, Defendants imply that subsequent transactions between the Tribe and the Jurrius Defendants *were* approved by the Secretary of Interior and that Secretarial "approval was obtained when specific transactions required it."  Doc. 69, p 4; Doc. 43-2, p 26 ¶ 12, p 28 ¶ 18. However, the Secretary of Interior was never asked to approve, and never did approve, the transfer of *any* assets from the Tribe to the Jurrius Defendants, and the Defendants' implications to the contrary in their pleadings is a misrepresentation to the Court.

*Blackfeet Tribe*, 471 U.S. 759, 766 (1985).  Instead, "[t]he canons of construction applicable in Indian law are rooted in the unique trust relationship between the United States and the Indians." *County of Oneida v. Oneida Indian Nation*, 470 U.S. 226, 247 (1985).  Applying the canon that laws intended to benefit Indians must be liberally construed in their favor, words such as "transfer" and "shares" in § 464, or "encumbrance" and "disposition" in the Tribe's Constitution must be broadly construed to accomplish the Congressional intent under the IRA of preserving and protecting tribal assets. *See also Ramah Navajo Chapter v. Lujan*, 112 F.3d 1455, 1462 (10th Cir. 1997) (if a statute passed for Tribe's benefit can "reasonably be construed as the Tribe would have it construed, it must be construed that way").

But even without resort to liberal interpretation, it is frankly disingenuous for Defendants to assert that the FCAs did not grant Defendants a claim to interests in tribal assets. Doc. 69, p 2.  Count 1 of their counterclaim relies upon the FCAs to claim a ten percent interest in the earnings of the Venture Fund,[4] and compensation totaling $1,750,000, all of which accrued *after* Jurrius' resignation and cessation of work for the Tribe in August 2007.  Doc. 43-2, ¶¶ 27, 28.  This cannot in good faith be characterized as anything *but* a claim to tribal assets.  "Encumbrances are not confined to the law of property, but pertain to the law of obligations also.  Choses in action may be mortgaged, settled in trust, or otherwise made the subject-matter of *jura in re aliena*, no less than

---

[4] The FCA Amendment, Ex. A, p 13, ¶ 3, does not specify whether the 10% interest in Venture Fund earnings is in the gross or net earnings, and also does not specify a temporal limitation on the interest, indicating that Jurrius, in drafting the Amendment, may have intended a perpetual interest.

land and chattels." JOHN SALMOND, JURISPRUDENCE 435-36 n. (k) (Glanville L. Williams ed., 10th ed. 1947). *See* "Encumbrance" in Black's Law Dictionary (8th ed. 2004).

Finally, the single case Defendants cite in opposition to dismissal under § 464, has no application here. *Ashley v. U.S.*, 408 F.3d 997 (8th Cir. 2005). Unlike the individual tribal members in *Ashley* who lacked standing to prosecute a claim under §464, here the Tribe itself is the plaintiff with proper standing. Furthermore, the language in *Ashley* which Defendants cite is *dicta* and its rationale was rejected in *Yonadi v. IRS*, 21 F.3d 1292, 1296 (3rd Cir. 1994). More importantly, the bond transaction that was the subject of the § 464 claim in *Ashley* was *approved* by the federal government, 408 F.3d at 999, whereas Defendants' FCAs were not. And unlike Defendants here, the bondholders in *Ashley* were *not* granted a percentage share, or claim to "direct ownership interests" in tribal assets. 408 F.3d at 1002. In short, unlike the bond transaction in *Ashley*, the FCAs do implicate § 464 because they purport to grant Defendants percentage shares in the Tribe's assets, and ultimately, to require a transfer of "shares" or interests in tribal assets from the Tribe to the Defendants.

## II. The Doctrine of Recoupment is Not Applicable to Void Contracts

Where requisite federal approval for the alienation of Indian property interests is not obtained, the underlying contract, conveyance, or transaction is not simply *voidable* but is void *ab initio*--a legal nullity. This, by itself, completely refutes Defendants' characterization of the approval requirement as a mere "technicality."[5] And it also

---

[5] To illustrate that federal approval is not a mere "technicality," consider the implementing regulations for the approval of agreements under the Indian Minerals Development Act , 25 U.S.C. §§ 2101-08, found under 25 C.F.R. §§ 225.1-225.40. The regulations require, *inter alia*, a determination that the agreement presented for approval is in the best interest of the Indian tribe, enumerating various factors the Secretary

refutes Defendants' argument that their claims for breach of contract, unjust enrichment, and promissory estoppel should be treated as claims *sounding* in recoupment and allowed as an exception to the Tribe's sovereign immunity under the holding in *Berrey v. ASARCO, Inc.*, 439 F.3d 636, 643 (10th Cir. 2006).[6]

This case is easily distinguished from all cases in which claims sounding in recoupment have been held to waive Tribal sovereign immunity. None of those cases involved a Tribe's claim, as here, that the underlying contract or transaction on which the recoupment claim is based is null, void and unenforceable. Indeed, it would be a gross perversion of the equitable doctrine of recoupment to hold that that a contract which is unenforceable because of its illegality is nonetheless enforceable "through the back-door" of recoupment. To avoid this perverse result, courts have long ruled that for recoupment to be asserted, there must first be an enforceable contract between the parties. *E.g., Commercial Factors Corp. v. Zephyr Awning Corp.*, 91 N.W.2d 511, 516 (Mich. 1958)(a recoupment claim may not be based on a contract that is void under the statute of frauds); *Duckett Creek Sewer Dist. v. Golden Triangle Dev. Corp.*, 32 S.W.3d

---

of Interior must consider in making this determination. The regulations also incorporate procedural protections, such as requiring the Secretary to provide the affected Tribe with written findings forming the basis of his or her intent to approve or disapprove the agreements. These preliminary findings enable the Tribe to reconsider or renegotiate the agreement, or unilaterally cancel it altogether.

[6] The case frequently cited for the proposition that recoupment claims are an exception to sovereign immunity is *Bull v. United States*, 295 U.S. 247, 260-63 (1935). However, the Eastern District of California has questioned the logic of mechanically applying "recoupment" theories to nullify sovereign immunity, saying "[t]he theory appears to have been expanded well beyond its modest antecedents and to have been stated in the treatises and some of the cases in much more general terms than at least Supreme Court case law would justify." *U.S. v. Iron Mountain Mines, Inc.*, 881 F. Supp. 1432, 1454-56 (E.D. Cal. 1995). And the Wyoming Supreme Court, in refusing to apply recoupment in a state action to collect severance taxes, said flatly, "[t]he Bull case has been distinguished, explained, and questioned just short of death. . . Bull and its progeny may have some residual viability, particularly in federal tax litigation, but we decline to consider it further in this matter." *Texaco Inc. v. State Bd. of Equalization*, 845 P.2d 398, 402 (Wyo. 1993).

178, 181-83 (Mo. Ct. App. 2000)(developer's failure to comply with statutory requirement for a written contract barred the developer from seeking reimbursement through recoupment); *Sloan v. Kubitsky*, 712 A.2d 966, 968 (Conn. App. Ct. 1998)(for recoupment to be asserted, there must be an enforceable contract); *Smith v. Smith*, 558 A.2d 798, 804 (Md. Ct. Spec. App. 1989)(allowance of recoupment "would be inconsistent with the purposes underlying" the equitable doctrine of recoupment).

### III.  The Equitable Counterclaims Must Fail

Defendants also argue their equitable claims are pled in the alternative and must be allowed to proceed if this Court finds the FCAs are void.  That a party may be unjustly enriched if the Court acts a certain way is not a claim.  It is a (meritless) defense.[7]  Defendants misread *Weinbach v. Orthodontic Centers of Colorado, Inc.,* 2007 WL 2786426 (D. Colo.).  Nothing in that case suggests either party had, at the time of this Court's ruling, already alleged equitable claims, or that, like here, the party alleging unjust enrichment had *already* received compensation under the void contract. As this Court explained, there are two grounds upon which a court may void a contract: where the contract violates clearly expressed legislative intent, or where the interest in the contract's enforcement is outweighed by public policy.  *See Weinbach* at *5 (internal quotations, citation omitted); *see also* Restatement 2d of Contracts, § 178(1).   In *Weinbach*, because the legislature had not expressly provided that contracts made in violation of the relevant statute were void, this Court balanced the interest in

---

[7] Defendants admit their equitable claims are nothing but an effort to *"retain* the compensation and other value they have received" because the Tribe "would be unjustly enriched" if the FCAs are rescinded.  *See* Def Br. 13, 15 (emphasis added).  Indeed, in addition to being listed as "counterclaims", these arguments are both listed as affirmative defenses.  *See* Dkt 43 p. 21.  To the extent Defendants' claims sound in recoupment, they are addressed above.

- 9 -

enforceability against the policy at issue.  *Weinbach* at *6.  The prospect that one party could sue for unjust enrichment was simply a factor in that balancing test.  *Id.* at *7.  Here, the applicable statutes explicitly void the FCAs.  *See* 15 USC § 80b-15(b); 25 USC §§ 177, 464.  With explicit statutory guidance, no "balancing" need occur; the analysis is at an end.[8]  *See* Restatement 2d Contracts § 178(1).  Whether the Tribe may be unjustly enriched by the rescission of the FCAs is neither relevant to the analysis of whether to enforce them, nor a cause of action if they are void.  "A court will not enforce a contract that violates public policy even if the failure to do so is 'unfair' to one of the parties." *Equitex, Inc. v. Ungar*, 60 P.3d 746, 750 (Colo. Ct. App. 2002).   "A contract which is contrary to public policy is void...neither party to the contract is estopped from questioning it merely because the other party has parted with a property right or rendered service in reliance upon it." *Id.* (quoting *Menzel v. Niles Co.*, 86 Colo. 320, 324, (1929)).  As previously explained,[9] the Tribe's sovereign immunity precludes the equitable claims; if the FCAs are void, Defendants have no remedy.  That this result may be "unfair" in the eyes of Defendants - themselves wrongdoers - is irrelevant.

| **FREDERICKS PEEBLES & MORGAN LLP** | **MILBERG LLP** |
|---|---|
| /s/ Thomas W. Fredericks<br>*Thomas W. Fredericks*<br>1900 Plaza Drive<br>Louisville, CO 80027<br>Tel: (303 ) 673-9600<br>Fax: (303) 673-9155<br>tfredericks@ndnlaw.com<br>**Counsel for Plaintiff** | /s/ Benjamin Y. Kaufman<br>*Benjamin Y. Kaufman*<br>One Pennsylvania Plaza, 49th Floor<br>New York, New York 10119<br>Tel: (212) 594-5300<br>Fax: (212) 868-1229<br>bkaufman@milberg.com<br>**Counsel for Plaintiff** |

---

[8] For this reason, Defendants' claims of estoppel and unjust enrichment as affirmative defenses must also fail.

[9] *See* Doc, 61 p. 11 - 15.

- 11 -

## CERTIFICATE OF SERVICE

I hereby certify that on May 5, 2009, I electronically filed the foregoing **REPLY IN SUPPORT OF MOTION TO DISMISS THE AMENDED COUNTERCLAIMS** with the Clerk of the Court using the CM/ECF system which will send notification of the filing to the following email addresses:

**SHERMAN & HOWARD L.L.C.**
Gordon W. Netzorg
Susan Bernhardt
633 Seventeenth St., Ste. 3000
Denver, Colorado 80202
Telephone: (303) 297-2900
Fax (303) 298-0940
gnetzorg@shermanhoward.com
sbernhardt@shermanhoward.com

**Counsel for Defendants John P. Jurrius, Jurrius Group LLP, and Jurrius Ogle Group LLC**

          By: _/s/ Tia Gerung_
          Tia Gerung, Assistant
          FREDERICKS PEEBLES & MORGAN
          1900 Plaza Drive
          Louisville, CO 80027
          Telephone: (303) 673-9600
          Facsimile: (303) 673-9155